IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

CHRISTINE LUCERO as Next Friend
to DAN LUCERO

       Plaintiff,

v.                                                     No.

CITY OF CLOVIS POLICE DEPARTMENT,
BRENT AGUILAR, TRAVIS LOOMIS,
DOUGLAS FORD

       Defendants.

## COMPLAINT FOR THE RECOVERY OF DAMAGES CAUSED BY THE DEPRIVATION OF CIVIL RIGHTS

Plaintiff brings this complaint for damages caused by the violation of Dan Lucero's civil and constitutional rights. Plaintiff files this complaint under the Federal Civil Rights Act, the Constitution of the United States, and the New Mexico Tort Claims Act. In support of this Complaint, Plaintiffs' allege the following:

### JURISDICTION AND VENUE

1. Jurisdiction over the subject matter of this action is conferred by 28 U.S.C. § 1331 and 42 U.S.C. §§ 1983 and 1988.

2. Venue is proper as the acts complained of occurred exclusively within Curry County, New Mexico.

### PARTIES

3. Dan Lucero ("Dan") is an individual and resident of Curry County, New Mexico.

4. Plaintiff Christine Lucero is an individual and resident of Curry County, New Mexico. Christine is the aunt of and Next Friend to Dan Lucero.

1

5. Defendant City of Clovis Police Department ("CPD") is a governmental entity within the State of New Mexico and a "person" under 43 U.S.C. § 1983. At all times material to this Complaint the CPD was the employer of the individual defendants.

6. At all material times Defendant Brent Aguilar was a police officer for the City of Clovis Police Department.

7. At all material times Defendant Aguilar was acting under color of state law and within the scope of his employment.

8. Defendant Aguilar is sued in his individual capacity only.

9. At all material times Defendant Travis Loomis was a Sergeant for the City of Clovis Police Department with supervisory duties.

10. At all material times Defendant Loomis was acting under color of state law and within the scope of his employment.

11. Defendant Loomis is sued in his individual capacity only.

12. At all material times Defendant Douglas Ford was the Chief of Police for the City of Clovis Police Department.

13. At all material times Defendant Ford was acting under color of state law and within the scope of his employment.

14. Defendant Ford is sued in his official capacity only.

## FACTUAL BACKGROUND

15. On February 22, 2019, Dan Lucero's mother called the Clovis Police Department and told the dispatcher her son, Dan Lucero, was suicidal.

16. Defendant Brent Aguilar, Defendant Travis Loomis, J. Romero, and Tony Bosque responded to the call and arrived at the Hotel Clovis Apartments, where Dan's mother lived.

17. The conversations and events that occurred throughout this incident were captured on video and audio with the officers' lapel cameras.

18. When they arrived, officers spoke with Dan Lucero's mother about the situation.

19. Dan's mother informed officers that Dan was suicidal.

20. Defendant Loomis asked Dan's mother if he had a gun, and she told him as far as she knew he did not have a gun and she had never seen him with a gun before.

21. Officers told Ms. Lucero that they were going to go talk to Dan.

22. Officers went up to Ms. Lucero's apartment where Dan was napping.

23. Defendant Aguilar brought his police service dog LEO ("PSD Leo") with him to the apartment.

24. Dan stepped up to the entrance of the apartment when officers arrived.

25. A clear, glass door separated the hallway between Dan and the officers.

26. Officer Loomis told Dan they needed to speak with him and make sure he was alright.

27. Officers told Dan his mother asked them to come check on him.

28. Dan told officers he was ok.

29. Soon after making contact with Dan, Defendant Aguilar told Defendant Loomis "If he opens that door and he steps--- he goes to step back in, I'm going to let Leo go. Travis, you clear on that?"

30. Defendant Loomis nodded yes.

31. Defendants decided minutes into their interaction with Dan that they would release the dog on him if he walked away.

32. Officers continued to argue with Dan, trying to coax him out of the apartment.

33. Dan was never told by officers that he was being investigated for any criminal activity.

34. Dan was never told he was going to be detained in relation to any criminal activity.

35. In fact, officers continually told Dan he was not in any criminal trouble.

36. Officer Romero told Dan, "You're not in trouble, man. I can assure you of that. We have to check your status and your welfare and we'll get out of your hair."

37. Defendant Loomis told Dan, "I just need you to open the door so I can see you."

38. All officers, including Defendant Loomis, were able to see Dan through the glass door.

39. Dan told officers that he was "ok" at least six (6) times during his four minute and fifty second (4:50) interaction with the officers.

40. Dan eventually agreed to step outside after getting his shoes from inside the apartment.

41. Officer J. Romero told Dan not to go back into the apartment, that he didn't need his shoes and they weren't going anywhere.

42. Officer Romero told Dan, "We're not here to hurt you. I assure you of that. We don't want anyone to get hurt."

43. Officer Romero then told him "We're not here to hurt you or be mean to you. We're here for a reason because your family is concerned about you."

44. Dan again told officers he was going to put his shoes on then he would come out.

45. Officers never told Dan that they would set the dog on him if he returned to the apartment to get his shoes.

46. Dan returned into his apartment with every intention of coming out to assure officers he was not suicidal.

47. Immediately as Dan entered into the apartment, Defendant Loomis opened the glass door with a key provided by the landlord.

48. Defendant Aguilar pushed his way through the line of police officers with his PSD Leo so he could be the first officer in the apartment.

49. Defendant Loomis and other responding officers allowed Defendant Aguilar to the front of the formation, and into the apartment.

50. Defendant Aguilar began yelling, "Come out here or the dog is going to bite you, Dan. Come out here Danny. Come out here Danny."

51. Defendant Loomis told Dan he was "going to get bit."

52. When Defendants Aguilar and Loomis entered the apartment, Dan was standing in his mother's living room with his shoes in one hand and nothing in the other.

53. Defendant Aguilar commanded Dan to get onto the ground.

54. Dan was clearly unarmed.

55. Within four (4) seconds, Defendant Aguilar released PSD Leo and yelled, "Fassen!" repeatedly, commanding his dog to attack Dan.

56. At no point during these four (4) seconds did Dan make any verbal or physical threats to the officers.

57. At no point during these (4) seconds did Dan run from the officers, reach for a weapon, or appear to have any weapons on or near him in the apartment.

58. Defendant Aguilar's dog sunk its teeth into Dan's leg and clamped down.

59. After the dog had Dan's leg in its jaws, Defendant Aguilar began yelling at Dan, "Get on the fucking ground!"

60. Dan had fallen to the ground and was screaming out in pain.

61. Defendant Loomis took out his handcuffs and cuffed Dan behind his back.

62. Defendant Aguilar yelled at Dan, "Daniel be quiet! Daniel be quiet! Daniel be quiet! Daniel be quiet!" then "Bad guy stop fighting my dog! Bad guy stop fighting my dog!"

63. Defendants allowed the dog to clamp down on Dan's leg for approximately 30 seconds.

64. Defendant Loomis made no attempt to intervene and have the dog removed from Dan's leg.

65. 30 seconds is an extraordinarily long amount of time to have a dog bite and tear on a person's leg.

66. Eventually, Defendant Aguilar commanded the dog to release.

67. Defendant Aguilar then congratulated the dog for the attack, telling him "Good boy!"

68. Dan was taken out of the apartment and transported to the hospital by ambulance.

69. When he arrived at the hospital in Clovis, hospital staff evaluated his serious injury.

70. The dog had bitten through Dan's jeans and torn his left calf open.

71. Muscle and tendons were visible through the large, open, gaping wound.

72. His injury was so severe that the Clovis hospital was not capable of treating him.

73. Dan was transported to the University Medical Center in Lubbock, TX for treatment of his injury.

74. Dan remained in the hospital for nine (9) days to receive wound care and treatment to prevent infection.

75. After he was released from the hospital, Dan continued to require constant medical care, so he was transported to a nursing home in Clovis, NM.

76. Dan remained in the nursing home for nine (9) days.

77. When Dan was released from the hospital, he required home healthcare.

78. A nurse came to his home to provide wound care twice per week.

79. Dan was released with a wound vacuum and specific wound care instructions.

80. Dan requires continued care for his serious injury.

## COUNT I: EXCESSIVE FORCE
### (Defendants Brent Aguilar and Travis Loomis)

81. Plaintiff restates each of the preceding allegations as it fully stated herein.

82. Dan has a Fourth Amendment right to be free from unlawful search and seizure.

83. This includes the right to be free from the use of excessive force.

84. Defendant Loomis was the sergeant on duty on the night of this incident.

85. Despite this, Defendant Loomis abdicated his authority to Defendant Aguilar.

86. Defendant Loomis allowed Defendant Aguilar to call the shots when they arrived at the apartment.

87. Defendant Loomis allowed Defendant Aguilar to retrieve his dog from his police unit before they went up to his mother's apartment.

88. Defendant Aguilar told Defendant Loomis that he was going to release PSD Leo on Dan if stepped back into the apartment.

89. Instead of disagreeing with Defendant Aguilar's decision to release a police dog on Dan for stepping into the apartment, Defendant Loomis agreed to Aguilar's plan.

90. When Dan went back into his mother's apartment, Defendants followed.

91. Defendant Loomis allowed Defendant Aguilar to pass him and enter the apartment before him with PSD Leo.

92. Defendant Loomis knew Defendant Aguilar would release PSD Leo on Dan.

93. Defendant Loomis knew that if PSD Leo was released he would attack and bite Dan.

94. Defendant Loomis told Dan he was "going to get bit."

95. Defendant Aguilar pushed his way through the other officers to be the first into Ms. Lucero's apartment.

96. Defendant Loomis allowed Defendant Aguilar to enter the apartment first, with PSD Leo.

97. When the defendants entered the apartment, Dan was standing in the living room.

98. Defendants had been informed by Dan's mother that she had never seen him with a gun, nor did she believe that Dan owned any guns.

99. When the defendants entered the apartment, it was obvious that Dan was not wielding any weapons, nor did he threaten the officers in any way.

100. Instead, Dan only had his shoes in his hands and his other hand was open and clearly empty.

101. Dan did not pose any threat to officers.

102. Defendant Loomis knew it was unreasonable, reckless, and unacceptable for Defendant Aguilar to release PSD Leo on Dan in this circumstance.

103. Instead of stopping the release of PSD Leo, he continued to allow Defendant Aguilar's plan of attack to continue.

104. Almost immediately, Defendant Aguilar released PSD Leo and commanded him to attack Dan.

105. Defendant Aguilar decided to release the dog, regardless of what Dan was going.

106. This decision was made by Defendant Aguilar before Dan entered the apartment.

107. It was unreasonable and unacceptable for Defendant Aguilar to have used PSD Leo in this situation.

108. As the high-ranking officer at this scene, Defendant Loomis had a duty to intervene and prevent the vicious dog attack.

109. Defendant Loomis failed to intervene and prevent Defendant Aguilar from entering the apartment to release the dog on Dan.

110. Defendant Loomis further failed to intervene after Defendant Aguilar had released the dog on Dan's leg.

111. Defendant Loomis allowed the attack to continue for thirty (30) seconds without intervention.

112. Defendant Loomis had ample time to stop the attack, or command Defendant Aguilar to stop the attack.

113. Instead, Defendant Loomis allowed the dog to bite, twist, and tear Dan's leg for an extraordinary length of time until Defendant Aguilar decided to release the dog.

114. As a result of the excessive force used by Defendant Aguilar and Defendant Loomis's failure to intervene, Dan suffered serious injuries, including physical and emotional injuries, pain and suffering.

### COUNT II: CUSTOM AND POLICY OF VIOLATING CONSTITUTIONAL RIGHTS
### (Official Capacity Defendants)

115. Plaintiffs restate each of the preceding allegations as if fully stated herein.

116. Defendant Ford was the Chief of Police at all material times to this complaint.

117. Defendant Ford was the final policy maker, responsible for the hiring, training, and supervision of the Clovis Police Department employees.

118. Defendant Ford's policies therefore become the customs and policies of the City.

119. During his tenure, Defendant Ford practiced a custom and policy of unreasonable and excessive use of force.

120. Defendant Aguilar was trained on the policies and procedures of the Clovis Police Department.

121. Specifically, Defendant Aguilar has been trained on how and when to deploy police PSD Leo.

122. Defendant Aguilar has routinely used unreasonable or excessive force when interacting with members of the community in Clovis.

123. Defendant Ford has allowed and ratified these uses of force.

124. In August 2014, Defendant Aguilar arrested Jorge Corona during a traffic stop.

125. Mr. Corona was the passenger in the vehicle stopped by Defendant Aguilar.

126. Defendant Aguilar arrested Mr. Corona for failing to show him his ID.

127. Dashcam footage of the incident shows Defendant Aguilar threw him "facedown into the asphalt" while his hands were handcuffed behind his back.

128. According to the Complaint filed by Mr. Corona, this use of force resulted fracturing Mr. Corona's cheekbone and causing other injuries."

129. In September 2015, Defendant Aguilar was involved in an on-foot pursuit of a man with a misdemeanor warrant for a probation violation.

130. On this encounter, Defendant Aguilar pursued Mr. Robert Moya with K-9 unit.

131. According to the complaint filed by Mr. Moya, based on lapel footage of the incident, Defendant Aguilar told him to come out with hands hands up or they would release the dog.

132. Defendant Aguilar apparently also told Mr. Moya if Leo found him he would bite him.

133. According to the complaint filed by Mr. Moya, Defendant Aguilar released his police dog, who attacked and seized Mr. Moya "by biting his head and latching tightly onto Plaintiff's upper arm with his jaw."

134. Following this incident, Defendant Aguilar's actions were reviewed by the Clovis Police Department.

135. The Department found Defendant Aguilar's actions were "reasonable and within [CPD's] policy."

136. Between February 2014 and May 2017, Defendant Aguilar deployed Leo at least 9 times, all of which resulted in bites to Clovis citizens.

137. In October 2018, Defendant Aguilar shot a 22-year old Clovis man four (4) times during an on-foot pursuit, killing him.

138. Following this incident, Defendant Aguilar was placed on paid administrative leave for seven days, then returned to duty.

139. Thirty-six (36) days after Dan Lucero was attacked, Defendant Aguilar released his police dog on a 17-year old child, biting his left wrist and right leg.

140. This attack occurred after the child surrendered to Defendant Aguilar's commands and was on his knees with his hands up.

141. This attack resulted in serious injuries to the child.

142. Despite his continued and frequent use of excessive force, Defendant Ford has allowed Defendant Aguilar to continue serving CPD.

143. Upon information and belief, Defendant Aguilar has not faced discipline for his use of force during his time as a police officer.

144. As a result, Defendant Ford has emboldened Defendant Aguilar to continue his practice of excessive force against members of the Clovis Community.

145. In effect, Defendant Ford has embraced Defendant Aguilar's conduct as acceptable practice for officers in the Clovis Police Department.

146. The policies, customs, decisions, and practices of Defendant Ford has created a climate within CPD where excessive or unreasonable uses of force are accepted.

147. There is a causal connection between Defendant Ford's policies and the violation of Dan's constitutional rights.

148. As a result of these policies, Dan has suffered serious physical injuries, emotional damages, including PTSD.

### COUNT III: BATTERY
### (Defendant Brent Aguilar)

149. Plaintiff restates each of the preceding allegations as if fully stated herein.

150. When Defendant Aguilar first arrived at Mr. Lucero's mother's apartment, he did not bring PSD Leo out of his vehicle.

151. After he and the other responding officers spoke with Ms. Lucero, Defendant Aguilar returned to his unit and retrieved Leo.

152. Defendant Aguilar brought PSD Leo to the apartment intending to use him in response to the welfare check on Dan.

153. Defendant Aguilar told Defendant Looms he was going to release PSD Leo on Dan if he stepped back into his home.

154. After speaking with Dan, officers opened the door to the apartment and Defendant Aguilar forced his way through to the front.

155. Defendant Aguilar told Dan that he was going to release his dog.

156. Defendant Aguilar knew that if he released Leo, he would bite Dan.

157. Police service dogs are trained to find and bite.

158. Defendant Aguilar released Leo and commanded him to attack Dan.

159. Immediately, as he was trained, Leo attacked Dan and bit his leg repeatedly and continuously for approximately 30 seconds.

160. This dog attack was an harmful and offensive touching that resulted in serious injury to Dan.

161. The above described actions constitute a battery upon Plaintiff within the meaning of Section 41-4-12 of the New Mexico Tort Claims Act.

162. As a direct and proximate result of this battery, Dan suffered serious, life-threatening physical injuries, pain and suffering, and emotional injuries.

### COUNT IV: ASSAULT
### (Defendant Brent Aguilar)

163. Plaintiff restates each of the preceding allegations as if fully stated herein.

164. When Defendant Aguilar entered the apartment, he told Dan he was going to release his dog on him.

165. Dan watched Defendant Aguilar charge into his mother's living room with PSD Leo on a short lead.

166. Defendant Aguilar threatened to release Leo again after he entered the living room.

167. Defendant Aguilar's threats to release his dog on him placed Dan in a reasonable apprehension of an imminent battery.

168. Defendant Aguilar released the dog in front of Dan and yelled an attack command.

169. Dan watched as Defendant Aguilar's police dog charged at him and grabbed his leg.

170. As a direct and proximate cause of Defendant Aguilar's actions, Dan has suffered serious emotional damages.

## JURY DEMAND

171. Plaintiffs hereby demand a trial by jury on all counts.

WHEREFORE, Plaintiffs requests judgment as follows:

1. Compensatory damages in an as yet undetermined amount, jointly and severally against all Defendants, including damages for attorney's fees and emotional harm.

2. Punitive damages in an as yet undetermined amount severally against the individually named Defendants.

3. Reasonable costs and attorney's fees incurred in bringing this action.

4. Such other and further relief as the Court deems just and proper.


Respectfully submitted,

COYTE LAW P.C.


 /s/ Alyssa D. Quijano
Alyssa D. Quijano
Matthew E. Coyte
Attorneys for Plaintiff
3800 Osuna Road NE, Suite 2
Albuquerque, NM 87109
(505) 244-3030